Parker, Commissioner of Revenues *v.*
Kern-Limerick, Inc.

4-9924                                            254 S. W. 2d 454

Opinion delivered January 12, 1953.

Rehearing denied February 23, 1953.

*O. T. Ward,* for appellant.

*Rose, Meek, House, Barron & Nash* and *Berryman
Green,* for appellee.

Ward, Justice. The United States of America,
through and on behalf of the Navy Department, entered
into a written contract [designated as NOy23197] with
Winston Bros. Company, C. F. Haglin & Sons Company,
Missouri Valley Contractors, Inc., and Sollitt Construc-
tion Company, Inc. [hereinafter referred to as WHMS]
to construct a Naval Ammunition Depot at Shumaker,
Arkansas, the total cost of which was approximated at

$30,800,000. By the terms of the contract of employment WHMS was to procure all labor, supplies, materials, etc., necessary for constructing and equipping said depot and pay for the same, and the Government was to reimburse WHMS for all such expenditures and pay them, in addition, the sum of $580,000 for their services as contractors. The type of contract referred to is designated and is generally known as a "Cost-Plus-a-Fixed-Fee Contract". Other provisions of the contract will be specifically mentioned later.

The question herein to be decided arose in the manner presently set forth. On December 14, 1950, Kern-Limerick, Inc., a machinery and equipment company of Little Rock, Arkansas, sold to WHMS [as contended by appellant] or to the United States [as contended by the latter] two diesel tractors for a total price of $17,146.66, and the tractors were delivered at the site of construction at Shumaker, Arkansas. The Revenue Commissioner for the State of Arkansas demanded payment from Kern-Limerick, Inc. in the sum of $342.93 as a 2% tax on the sale price pursuant to the provisions of the Arkansas Gross Receipts Act of 1941. Payment of the tax was made under protest by Kern-Limerick, Inc. and later suit was filed in the Chancery Court of Pulaski County, Arkansas, for the recovery of the amount so paid. The United States intervened in this suit, contending that the sale in question was a sale to it and that consequently no tax was collectable thereon by the State of Arkansas. The Chancery Court held with the contention of the United States and the Commissioner of Revenues for the State of Arkansas has appealed to this Court for a reversal.

The 1941 Gross Receipts Act, referred to before, provides that no tax shall be paid on sales to the United States; therefore, the question confronting this Court is whether the sale in question was made to WHMS or to the United States. To answer this question it is necessary to examine the provisions of the contract between WHMS and the United States and to do so in the light of court decisions relating thereto.

In order to obtain the savings in money and time that may reasonably be expected by the negotiation of a cost-plus contract such as the one here involved, it is obvious that the U. S. Government must maintain, and so the contract must provide, effective control over all purchases by the contractor; otherwise, the Government could not be assured it would receive standard materials and services at the lowest possible prices. Therefore, as would be expected, the United States in this case wrote into its contract with WHMS provisions for strict control of all purchases of labor, materials, and equipment which were to be used in or for the construction of the Ammunition Depot.

*Contract.* Some of the pertinent provisions were: (a) All applications for purchases, all bids, and all purchases must be made on Government [Navy] forms and all must be approved by an Officer in Charge who was an officer representing the Navy Department; (b) After approval WHMS consummated the transaction by paying the purchase price and taking delivery at the site of construction at Shumaker, Arkansas: (c) Upon presentation of the evidence of purchase and upon a showing that all requirements had been complied with, the purchase price paid, and delivery made, the Government would reimburse WHMS. Before reimbursement it must also appear that the Government had appropriated money for that purpose; (d) Title to the property so purchased never vested in WHMS but did vest in the United States; (e) WHMS was acting as purchasing agent for the United States in negotiating all purchases; (f) The United States was obligated to the vendor to pay the purchase price; and (g) The vendor was to make demand for payment by submitting an invoice to WHMS.

Some of the terms of the contract, including those designated (e), (f) and (g) above, were printed on the back of all "Request for Bids" and "Purchase Order" blanks which went to prospective vendors.

*Arkansas Statute.* The tax sought to be imposed herein by the Arkansas Revenue Commissioner is levied by Act No. 386 of 1941, which specifies a tax of 2%

[*Ark. Stats.* § 84-1903] upon the gross proceeds derived from all sales, and requires the vendor [*Ark. Stats.* § 84-1908] to pay the tax to the Commissioner. Some other pertinent provisions of said Act No. 386 are set out below.

(1)  *Ark. Stats.* § 84-1902 (c):

"Sale: The term 'sale' is hereby declared to mean the transfer of either the title or possession for a valuable consideration of tangible personal property, regardless of the manner, method, instrumentality, or device by which such transfer is accomplished."

(2)  *Ark. Stats.* § 84-1902 (i):

"Consumer—User: The term 'consumer' or 'user' means the person to whom the taxable sale is made, or to whom taxable services are furnished. All contractors are deemed to be consumers or users of all tangible personal property including materials, supplies and equipment used or consumed by them in performing any contract and the sales of all such property to contractors are taxable sales within the meaning of this Act.

(3)  *Ark. Stats.* § 84-1903 (e)—last paragraph:

"Sales of service and tangible personal property including materials, supplies and equipment made to contractors who use same in the performance of any contract are hereby declared to be sales to consumers or users and not sales for resale."

As has been previously stated, the vital question is: Who was the "purchaser" in this instance? Was it WHMS or the United States? It is conceded that if it was the former the tax is collectable, and if it was the latter the tax is not collectable. The opinion of the United States Supreme Court in the case of *Alabama* v. *King and Boozer* [which will be cited later], in which this same question was under consideration, contains this language: "Who, in any particular transaction like the present, is a 'purchaser' within the meaning of the statute, is a question of state law on which only the Supreme Court of Alabama can speak with final authority."

Giving a reasonable interpretation to the language of the Arkansas Gross Receipts Act as it is set out in sub-paragraphs above (1) defining a Sale, (2) defining Consumer-User, and (3) relating to contractors, and having in mind all the provisions of the contract between WHMS and the United States, we are of the opinion that WHMS was the "purchaser" in this instance and that consequently Kern-Limerick, Inc., is liable to the Commissioner for the tax on the two tractors which it sold.

Notwithstanding the above, however, it is obvious that the State of Arkansas could not arbitrarily define WHMS as the "purchaser" and thereby impose a tax on the United States Government if in fact and in truth the latter was the purchaser in this instance, and so we will proceed to consider the question from that standpoint after making this further observation. In determining whether or not the State of Arkansas has acted arbitrarily in enacting this particular Act with the language it contains depends on whether the Act is discriminatory, and, particularly in this instance, whether it discriminates against the United States. The opinion referred to above recognizes this test and makes it clear that the mere fact that the tax is eventually passed on to the Federal Government is no indication it is discriminatory or that it violates the immunity of the Government. In our opinion the Arkansas Statute meets all the tests.

*Was the United States the Purchaser?* In coming to the conclusion that the United States was not, in this instance, the "purchaser," we base our decision primarily on the opinion in the case of *Alabama* v. *King & Boozer,* 314 U. S. 1, 62 S. Ct. 43, 86 L. Ed. 3, decided in 1941. The question for decision in that case was the same as presented here and was based on facts, with the exceptions later noted, very similar to the facts of this case. The opinion which overruled some former decisions and approved others is comprehensive and logical and appears to be a landmark case on the issue involved. It upheld the imposition of a sales tax by an Alabama Stat-

ute on the sale of lumber by King and Boozer to a cost-plus-a-fixed fee contractor who was engaged in constructing a project for the Government pursuant to a contract presently to be mentioned.

For the sake of brevity it suffices for this opinion to say that the Government contract in the *King and Boozer* case was like the contract here with the same provisions and regulations except three on which the intervener relies to distinguish the two cases. The three exceptions referred to are: (a) In the cited case the contractor was liable to the vendor for the purchase price while here the contract provides the Government shall be liable; (b). Here the contract designates the contractor [WHMS] as Purchasing Agent for the Government, while in the cited case no such provision appears in the contract; and (c) Here the contract provides that title to any purchased article vests immediately in the Government while in the cited case it vested in the Government upon delivery at the site of construction and approval by the Government.

It is our judgment that the distinguishing features set out above are more synthetic than real and that they do not justify a conclusion here different from that reached in the *King and Boozer* opinion.

(a) Appellees lay great stress on the fact that here the Government has obligated itself to pay the vendor and that this indicates the Government was the real purchaser, and say that this feature, which was lacking in the *King and Boozer* case, was a necessary element to sustain the opinion. The cited opinion does contain this phrase: ''It is equally plain that they [the contractors] did not assume to bind the Government to pay for the lumber. . . .''. We are not convinced that the court attached the same importance to this feature as appellees do, but we are convinced that there is actually no real difference. Under the terms of the contract here it is hard to see how the credit of the Government could be pledged to the vendor. In the process of buying the tractors the Government [through the Navy Officer in Charge] checked every step in detail. When the sale was

finally made the tractors were paid for by WHMS, delivered to the site of construction, and again checked and inspected by the agent. Only then and after WHMS proved to the Government's satisfaction that the purchase price had been paid by WHMS to Kern-Limerick, Inc., did the Government reimburse WHMS. We are convinced that this provision pledging the credit of the Government was not placed in the contract because of any necessity to further protect the interest of the Government, but for another purpose, and maybe considered redundant. We understand appellees do not seriously deny this provision was inserted to avoid the effect of the decision in the *King and Boozer* case. Granting the propriety of such purpose, we do not think it effective.

(b) *WHMS as Purchasing Agent.* Much of what was said above applies to this provision of the contract and especially as to the possible purpose of its insertion. Actually, the contractor in the *King and Boozer* case acted as effectively as an agent for the Government as WHMS does under the contract in this case. However, in neither case do we deem it proper to speak of the contractor as an "agent" because in each instance he was a contractor [an independent contractor] and was so designated in the contract of employment. Whether WHMS could be legally made an agent for the purpose of making purchases for the Government in this instance will be later discussed.

(c) *Title in the Government.* The fact that under the terms of the contract title to the tractors never rested in WHMS also, as we view the entire case, fails to distinguish this case from the *King and Boozer* case. There the title to the lumber rested in the contractor only until the lumber was delivered and paid for and then title automatically vested in the Government. The practical result was the same in both instances and we are unwilling to say that the legal fiction of divesting WHMS of title momentarily here has any significant bearing on the immunity of the United States from taxation. By no process of reasoning can we see how such a provision was necessary to better protect the interest of the Gov-

ernment, and we again conclude it must have been devised for another purpose.

Before the decision in the *King and Boozer* case Congress had refused to exempt from taxation purchases made by cost-plus contractors in constructing projects for the Government. Since the decision an attempt to evade its effect was made by proposed legislation in the Congress, but, after exhaustive hearings, Congress refused to sanction such enactment. In view of this definite attitude on the part of the Government itself, we think any attempt to reach a different result by skillful legal phraseology should be cautiously considered. We recognize the supremacy of the Government in the field of taxation and the urgency of the need for funds by both the State and Federal Governments, but where the interests of the two conflict, it is necessary to have a division line with due respect for both. This idea is well expressed, in the opinion referred to, in this language:

"So far as such a non-discriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties."

*Armed Services Procurement Act of 1947.* This Act of Congress will be referred to by sections as it appears in *U. S. C. A.,* Volume 41, page 189, Title 41, beginning with § 151. In some way, appellees urge, this Act strengthens their contention that the United States was the actual purchaser in this instance. Their theory seems to be that the Act gives direct authority to the Navy Department to make purchases for its own use and purposes, that this authority can be delegated to an agent, and that such delegation was made in this instance to WHMS. We do not agree with this interpretation of the Act.

As we see it, the over-all purpose of this Procurement Act was to empower the Navy Department [as well as the Army, Air Force and Coast Guard] to purchase [or contract to purchase] supplies or services for

its own *use,* as stated in § 151. Considering, without holding, the Act authorized the Navy Department to buy an Ammunition Dump at Shumaker, Arkansas, [had one been in existence] for its use, it does not follow that the Navy Department was authorized to buy nails, lumber, cement, tractors, etc., which were not to be *used* by the Navy but by WHMS [in this instance] to construct, as independent contractors, the Ammunition Dump.

*Delegation of Agency.* Appellant takes the position that even if the Navy Department had the authority to make the purchase of the tractors here, it does not have the power under the Act to delegate this power to WHMS in this instance, and we agree with this view.

Section 156 reads as follows:

"§ 156. *Determinations and decisions—(a) Powers of agency head; finality; delegation.*

"The determinations and decisions provided in this chapter to be made by the agency head may be made with respect to individual purchases and contracts or with respect to classes of purchases or contracts, and shall be final. Except as provided in subsection (b) of this section, the agency head is authorized to delegate his powers provided by this chapter, including the making of such determinations and decisions, in his discretion and subject to his direction, to any other officer or officers or officials of the agency.

"*Non-delegable powers; delegation to chief procurement officer only.*

"(b) The power of the agency head to make the determination or decisions specified in paragraphs (12)-(16) of section 151 (c) of this title and in section 154 (a) of this title shall not be delegable, and the power to make the determinations or decisions specified in paragraph (11) of section 151 (c) of this title shall be delegable only to a chief officer responsible for procurement and only with respect to contracts which will not require the expenditure of more than $25,000."

From the above we conclude that if the power in this instance was delegable at all, it would be only to an

officer or official of the Navy. Here the attempt was to delegate the power to WHMS. It appears probable to us that the purchases here were to be made under paragraphs (12)-(16) of section 151(c), in which case there was no power to delegate, rather than under paragraph (10) as contended by appellees, Paragraph (10) designates "supplies and services for which it is impracticable to secure competition."

Appellees also contend that § 153(b) provides the authority for the execution of the contract under consideration. We think they would be right if the purpose of the contract with WHMS had been to buy and accumulate [for the future use of the Navy Department] materials, as contended by appellees, is repugnant to the over-all content and purpose of the contract. Not only are the contractors designated and treated as such in the contract but obviously the only purpose of the contract was to obtain the experience, skill and knowledge necessary to assemble proper materials and services and fashion them into an ammunition depot in the most efficient manner. If the United States had only been interested in obtaining the services of a purchasing agent to buy materials it could, no doubt, have selected a competent Naval Officer at no extra cost to perform that function and, in all events, it could have surely secured the services of such an agent for considerable less than half a million dollars.

Reversed.

Justice GEORGE ROSE SMITH not participating.

ROBINSON, Justice (dissenting). No one will contend that if the Government is a *bona fide* purchaser of equipment, a state sales tax should be collected. If the Government is not the purchaser in this instance, it is hard to imagine a situation where it is ever the purchaser. The Government is invisible and intangible and must, necessarily, act through agents and has the exclusive right to appoint its own agent, or agents. Certainly no state has the power to say who can, or who cannot, act as agent for the Government. Moreover, the Government, through its

duly appointed agents, has the right, in fact it is the duty of such agents, to avoid incurring unnecessary expenses, including taxes.

The majority opinion is based primarily on *Alabama* v. *King & Boozer,* 341 U. S. 1, 62 S. Ct. 43, 86 L. Ed. 3. An attempt is made to show that there is no real distinction between that case and the case at bar, but, in my opinion, the facts in the two cases are altogether different. None of the facts on which the court based the opinion in the King and Boozer case are present in this case.

In the King and Boozer case the court said: ''As the sale of the lumber by King and Boozer was not for cash, the precise question is whether the Government became obligated to pay for the lumber and so was the purchaser whom the statute taxes.'' Then the court pointed out the following facts upon which it based the opinion that the Government was not the purchaser:

(1) The contractor was required to make all such contracts in his own name, and on his own credit, and not bind or purport to bind the Government or the contracting officer.

(2) The Government was not to be bound by the purchase contract.

(3) The purchase order stated that the purchase did not bind or purport to bind the United States Government or Government officers.

(4) The Government's credit was not pledged and the court said: ''We cannot say that the contractors would not, or that the Government was, bound to have paid the purchase price.''

The facts in the present case, which distinguish it from those set forth above are as follows:

(1) The Government was bound to pay for the equipment.

(2) The equipment was not bought in the name of the contractor or on the contractor's credit.

(3)   The Government's credit was pledged.

(4)   The request for bids provides that the contractor shall not acquire title to any of the property purchased.

If the contractor had attempted to divert to his own use property purchased for this Government job, there is no court in the land that would not have enjoined such diversion, upon a showing of the facts in the case. This is true because the contractor had acquired possession of the property as agent of the Government. At no time did the contractor own the property, nor was the contractor liable for the payment of the purchase price, and the property had not been sold on the credit of the contractor. To say here that the Government must pay the sales tax is to say that it can never, at any time, employ a contractor to do any work without paying a sales tax to the state on all material the Government buys and pays for and the contractor uses in doing such work.

For the reasons set out herein, I respectfully dissent.

Justice HOLT concurs in this dissent.